State v. Goldman Industrial Group, Inc., No. 816-12-02 Wncv (Teachout, J., May 19, 2003)


[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


## STATE OF VERMONT
## WASHINGTON COUNTY, SS.


| | | |
|---|---|---|
| **STATE OF VERMONT** | ) | |
| | ) | |
| **v.** | ) | **WASHINGTON SUPERIOR COURT** |
| | ) | **Docket No. 816-12-02 Wncv** |
| **GOLDMAN INDUSTRIAL GROUP, INC.** | ) | |
| **FELLOWS CORPORATION,** | ) | |
| **BRYANT GRINDER CORPORATION, and** | ) | |
| **BF ACQUISITION LLC** | ) | |


## FINDINGS OF FACT AND CONCLUSIONS OF LAW
### Hearing on Request for Preliminary Injunction


On February 10, 2003, the hearing on the State's request for a preliminary injunction took place. The State was represented by S. Mark Sciarrotta, Esq. Only Defendant BF Acquisition LLC appeared. It participated through its President, J. Hunter Banbury and was represented by Gary L. Franklin, Esq. The same day, the State moved for default judgment against the remaining Defendants. Following the evidentiary hearing, the State and BF Acquisition filed memoranda of law.

Fellows Corporation and Bryant Grinder Corporation, wholly owned subsidiaries of Goldman Industrial Group, Inc., conducted their businesses at two separate facilities in Springfield, Vermont. The Fellows Corporation was founded in Springfield in 1897 and moved to its facility in North Springfield in 1969. It manufactured gear cutting machines, tools, and optical comparitors. In 1991 it had approximately 300 employees working two shifts per day. Many hazardous materials were involved in its operations. The court has no details about the specifics of Bryant Grinder operations, but it engaged in similar manufacturing operations involving hazardous materials. The Fellows and Bryant Grinder facilities were Large Quantity

Generators of hazardous materials and regulated as such by the Waste Management Division of the Agency of Natural Resources in the Vermont Department of Environmental Conservation. Both businesses made periodic shipments of hazardous waste for disposal pursuant to regulations.

On February 8, 2002, the last shipment of hazardous materials left the Fellows facility, and on February 14, 2002, Goldman shut down both facilities and filed for bankruptcy. Regency held the first mortgage on the Fellows property, and First International Bank held a second mortgage. Hazardous materials remained on site, and under state regulations, after 90 days, or on May 8, 2002, the Fellows facility automatically became a hazardous waste "storage facility" under applicable regulations. Also in May, a representative of the Town of Springfield contacted Hunter Banbury, principal in the Cone Blanchard company, about the fact that the personal property assets of the businesses would become available for disposition.

On May 28, 2002, BF Acquisition LLC, whose president is Hunter Banbury, purchased assets, including inventory and intellectual property, from Fellows and Bryant Grinder through the bankruptcy estate. "Purchased Assets" are defined specifically in the Asset Purchase Agreement used for each sale in section 2.01. The language below identifies that portion of purchased assets which are tangible and located at the facility:

> (i) all personal property and interest therein, including machinery, equipment, furniture, office equipment (including all computers and related hardware), communications equipment, vehicles, transportation equipment, spare and replacement parts, tools, metal working equipment, laboratory test equipment, patterns, molds, dies, jigs, fuel, inventory, supplies and other tangible property, including without limitation, the items set forth on Schedule 2.01(i) including any assets thereon which are fixture [sic] which shall be attached to this Agreement within 10 days of the date of this Agreement;
>
> (ii) all raw materials, work-in-process, finished goods, "crib stock", packaging materials, supplies and other inventories;
> . . .

"Excluded Assets" were identified in part as "all of Sellers' real estate, including without limitation, all buildings, fixtures and improvements erected thereon." Section 2.02. "Excluded Liabilities" included any "liability, claim or obligation with respect to any litigation or legal proceeding. . .instituted hereafter, in connection with, or arising out of, the Businesses as operated by Sellers prior to the Closing." Section 2.04 (iii).

On May 31, 2002, BF Acquisition leased the Fellows facility for 7 months, from June 1, 2002 to December 31, 2002. Creditors Regency and First International Bank, holders of the first and second mortgages on the real estate, were identified as third party beneficiaries of the lease.

The purpose of the lease is defined in Section 1.6:

> Manner of Use.  Tenant shall use the Premises (a) to conduct or house a business related to the assembly, repair and sale of machine tools and related parts and service, or any part thereof, and to conduct any other activities incidental thereto including, without limitation, the liquidation or sale of all or a portion of the Purchased Assets, and (b) in a manner consistent with the obligations of Fellows under the Mortgage to keep the Premises in a condition and repair consistent with the condition of the Premises on the Commencement Date including, without limitation, Fellows' obligations under its mortgage relating to the Premises and to prohibit the commission of waste.

Section 1.9 is entitled "Regency as Beneficiary; Escrow, and provides in part: "Tenant's undertakings, obligations, covenants, and performances under Sections 1.3-1.8 hereof shall be for and inure to the benefit of Regency and, except for Section 1.8 [Tenant's Indemnity to Fellows and Regency], FIB."   Under Article X, Section 10.1, Access, "Tenant shall permit Regency reasonable access to the Premises during ordinary business hours."

Article IX on "Environmental Matters", Section 9.1, is as follows in its entirety:

> Tenant's Environmental Obligations.  Tenant shall not cause or permit the violation of any law relating to industrial hygiene or environmental conditions in connection with the Premises, including soil and ground water conditions, or use, generate, manufacture, store or dispose of any Hazardous Materials on, under or about the Premises.  Without Landlord's prior written consent, Tenant shall take no remedial action with respect to any Hazardous Material on, under or about the Premises, and shall not enter into any settlement agreement, consent decree or other compromise or agreement relating to any such Hazardous Material, except for emergency actions or actions required by governmental authority.  Tenant shall indemnify and hold Landlord and its secured lenders harmless from any loss, liability, cost, expense and/or claim (including without limitation the cost of any fines, remedial action, damage to the environment and clean up and the fees and costs of attorneys and other experts) arising from the use, release or disposal of any Hazardous Material on, under or about the Premises by Tenant or the transport of any Hazardous Materials to or from the Premises by Tenant; and the violation by Tenant of any law, rules or regulations relating to industrial hygiene or environmental conditions in connection with the Premises, including soil and ground water condition; the breach of any of the representations, warranties and covenants of Tenant

3

with respect to Hazardous Materials, and the actual contamination by Tenant of the Premises by hazardous waste or Hazardous Materials. Notwithstanding anything else contained herein, Tenant is not responsible for and will have no liability for any environmental conditions existing or prior to the Commencement Date.

BF Acquisition bought the assets of Bryant Grinder as well, but had no similar lease to use the Bryant Grinder facility for the assembly, repair, and sale of purchased assets. Rather, BF Acquisition simply removed its purchased assets from the Bryant Grinder facility.

Although the lease started on June 1st, BF Acquisition LLC undertook almost no activities within the facility until July.

On July 9, 2002, John Miller of the Waste Management Division (WMD) conducted a Pre-closure Compliance Evaluation Inspection in connection with the closing down of the Fellows facility. Present on that date were two persons conducting on-site due diligence assessments of the facility on behalf of Regency, and Don Garrow of BF Acquisition. The premises were in essentially the same condition as when the business stopped operations on February 14, 2002. Mr. Miller spent nearly 4 hours doing his inspection, and detailed the conditions and presence of hazardous materials in his report. He noted 175 drums of hazardous materials on the premises, as well as the presence of a variety of hazardous materials throughout the facility left under conditions when operations ceased, including, for example, a coolant pit and reservoir tank which contained operating levels of oil and coolant. Many of the drums of materials were located inside a designated hazardous waste storage building, although 25-30 such drums were located outside the building.

After this inspection, BF Acquisition began its activities with respect to its purchased assets. It cleaned and moved the numerous machines it had bought, many of which were quite large. This involved draining the fluids out of the machines, wiping them with rags, and cleaning up pools of fluid on the floor that were revealed when some of the machines were moved. Fluids from the floor cleanup and draining of the machines were put in barrels and consolidated with other similar fluids that had been left in small containers. The rags used for cleaning the machines were laundered at a commercial laundry. Containers of waste materials were moved to the storage building. BF Acquisition had scheduled an auction on site for October 7-9. Its goals were to clean, repair, and prepare the machinery and inventory for the auction, including making the premises presentable and suitable for auction purposes in order to maximize values at the auction. It also intended to leave the premises in a cleaned up condition after the auction for the benefit of Regency, as required by the lease.

The auction was held, and over 6,000 items were sold. Items ranged from office furniture to industrial machine tools as large as 60' x 20'.

At some point while items were being moved around, some barrels of materials were moved to an unheated building on the premises. There were three buildings located on the 200 acre Fellows property: the manufacturing building of 300,000 square feet, the hazardous waste building of 10,000-30,000 square feet, and a barn of 30,000 square feet. Mr. Banbury testified that only the manufacturing building was leased, but his testimony is not credible on this point as the written lease, which is quite specific and carefully written, includes the entire Fellows property.

John Miller of the WMD returned on October 30, 2002 for a second pre-closure inspection. He found that much waste had been consolidated in drums and moved to the hazardous waste building, while some usable product had been used. He found that there had been much movement of material, and that most drums were labeled, although not using a formal system. He noted a total of 251 drums on site. In the hazardous waste storage area, he noted two drums that were leaking. When he pointed out the potential for greater releases from freezing of water soluble coolant drums being in an unheated building, the representative of BF Acquisition expressed the position that what happened to the hazardous waste at that site was not the responsibility of BF Acquisition. Nonetheless, some of the barrels were moved back into a heated area at Mr. Miller's direction. Mr. Miller found that some areas had changed little since his prior inspection, as detailed in his report.

On December 27, 2002, the State filed its Complaint and Application for Preliminary Injunction in this suit against Goldman, Fellows, Bryant Grinder, and BF Acquisition. All Defendants were served on December 31, 2002.

On the same day, December 31, 2002, BF Acquisition's lease of the Fellows facility expired, and it gave up possession. It has not returned since. It filed its Answer and Cross-Claim on January 22, 2003.

On February 5, 2003, John Miller returned for a third pre-closing inspection. He found that further cleaning had occurred in some areas, and there were few or no changes in other areas, as detailed in his report. He found some signs of leakage in the hazardous materials storage area. He noted a total of 293 drums of hazardous materials.

**Conclusions**

1. Default is entered against Defendants Goldman, Fellows, and Bryant Grinder as to liability. The court has some questions about the forms of relief requested in the proposed decree, and will schedule a hearing to address the terms of the proposed Preliminary Injunction.

2. At the hearing and in the complaint, the State proceeded against BF Acquisition on a theory of "operator" liability. In its post hearing memorandum in reply to BF Acquisition's post hearing memorandum, it raised for the first time the claim that BF Acquisition was also a "generator" and argues a theory of "generator" liability. In a letter to the court, BF Acquisition

5

objected to the State using a "generator" theory of liability on the grounds that it did not have sufficient notice, and the State responded in a letter that the issue was properly before the court pursuant to V.R.C.P. 15(b). The court concludes that the State did not give BF Acquisition sufficient notice that it was proceeding on a "generator" theory of liability. The evidentiary hearing was conducted on the basis that the State was pursuing "operator" liability. The State did not take discuss a claim of "generator" liability until its Reply memo to BF Acquisition's memo, which the State filed one month after the hearing. The State's informal letter dated March 13, 2003 will not be treated as a Motion to Amend pursuant to Rule 15, as the State's attempt to add an additional basis for liability involves a significant issue of procedural fairness that required a proper and timely motion. The court cannot conclude on the basis of the record that Defendant had sufficient opportunity to present facts at the hearing responsive to the additional theory. Therefore, for purposes of ruling on the State's claim for a preliminary injunction based on the evidence presented at the hearing, the court is only considering the parties' arguments as they relate to an "operator" theory of liability.

3. Based on the Waste Management statutes in 10 V.S.A. Chapter 159 and the facts in evidence, BF Acquisition is a proper subject for enforcement under 10 V.S.A. § 6610a for violations of 10 V.S.A. § 6606 at the Fellows plant. Under 10 V.S.A. § 6606(a), "No person shall store, treat, or dispose of any hazardous waste without first obtaining certification from the secretary for such facility, site or activity. Certification shall be valid for a period not to exceed five years." BF Acquisition stored hazardous waste at the Fellows property. The facts do not show that a certificate was obtained, and it appears that BF never conformed to any of the certification requirements in 10 V.S.A. § 6606(b).

A major point of contention between the parties is BF Acquisition's responsibility for the hazardous materials left over from the Fellows/Goldman operations. BF Acquisition claims that it has no such responsibility because of the lease provisions. It relies on the lease in disclaiming any responsibility for the barrels of materials that were there when it arrived, and it further suggests that because all of the additional material that it put in barrels came from within machines it cleaned or from the floor or from smaller containers, it does not have responsibility for them, either. The facts do not support this conclusion. BF Acquisition bought *all* personal property. See the comprehensive definition of what it purchased in section 2.01 (i) and (ii) quoted in full above. The exclusions from Purchased Assets do not identify any tangible personal property, much less barrels of waste.

Furthermore, BF Acquisition disposed of usable product for its own benefit, and handled as much of it as it was in its interest to handle in order to accomplish its business purposes. There was no segregated section of personal property that belonged to Fellows/Goldman and was not part of the personal property that BF Acquisition bought and over which it had control. While the lease provisions are clear that BF Acquisition did not acquire, by virtue of the lease, Fellows and Goldman's own legal liability for its operations prior to the June 1st commencement date, those provisions do not exonerate BF Acquisition from responsibility for its own operations with respect to its own purchased assets. It is clear, however, that the scope of its operations was far more limited than those of Fellows and Goldman's. BF Acquisition's operations were

6

limited to cleaning and draining machines, moving them, consolidating containers of hazardous materials, conducting sales of assets, and placing and maintaining barrels of hazardous materials in storage.

Under the applicable statutes, BF Acquisition appears to have "stored" hazardous waste beyond credible dispute. "Storage" means "the actual or intended containment of wastes, either on a temporary basis or for a period of years; in such a manner as not to constitute disposal of such wastes." 10 V.S.A. § 6602(7). BF Acquisition drained hazardous waste from machines, placed it in barrels, consolidated waste from small containers into larger containers, and placed the containers at a location where they remained. The number of barrels on site increased from 175 to 293 during BF Acquisition's tenancy at the Fellows site.

"Treatment" requires a change of character or composition and means

> any method, technique, or process, including neutralization, designed to change the physical, chemical or biological character or composition of any hazardous or solid waste, so as to neutralize such waste, or so as to recover energy or material resources from the waste, or so as to render such waste safer for transport, amenable for recovery, amenable for storage, or reduced in volume, or for hazardous wastes, so as to render such waste non-hazardous.

10 V.S.A. § 6602(9). The facts do not support a conclusion that BF Acquisition "treated" waste. The facts are less clear about whether BF Acquisition "disposed" of any hazardous waste. The rags appear to have been laundered appropriately, and the State has not focused on that activity. "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any ground or surface waters." 10 V.S.A. § 6602(12). There is evidence that there was leakage from at least two barrels after BF Acquisition handled them.

Looking only to the statutes, then, under 10 V.S.A. § 6610a, the secretary has met the most significant predicate to enforcement. Section 6610a reads in pertinent part:

> Notwithstanding any other provision of this chapter, the secretary, upon receipt of information that the storage, transportation, treatment, or disposal of any solid or hazardous waste as defined herein may present a hazard to the health of persons or to the environment, or may be in violation of any provision of this chapter, the rules promulgated thereunder, or the terms or conditions of any order or certification issued under this chapter, may take such action as the secretary determines to be necessary.

10 V.S.A. § 6610a(a).

Among the enforcement actions available to the secretary is an action for injunctive relief, which is obtained by,

requesting that the attorney general or appropriate state's attorney commence an action for injunctive relief, or for the imposition of penalties and fines as provided in section 6612 of this title and other relief as appropriate. The court may issue a temporary injunction or order in any such proceedings and may exercise all the plenary powers available to it in addition to the power to:

> (A) enjoin future activities;
>
> (B) order the design, construction, installation or operation of abatement of facilities or alternate disposal systems;
>
> (C) order removal of all wastes and restoration of the environment and health;
>
> (D) fix and order compensation for any public property destroyed, damaged or injured;
>
> (E) assess and award punitive damages; and
>
> (F) order reimbursement to any agency of federal, state, or local government from any person whose act caused governmental expenditures under section 1283 of this title.

10 V.S.A. § 6610a(a)(2). See also 10 V.S.A. § 8221(c) for applicable preliminary injunction authority.

The above statutes (other than 10 V.S.A. § 8221(c)) are all located in Subchapter 1 (general provisions) of Chapter 159 (waste management) of Title 10. Looking no further than subchapter 1, there is no particular requirement that BF Acquisition be an "owner" or an "operator" of a facility of any kind in order to come within the enforcement power of ANR. BF Acquisition need only be a "person" storing, treating, or disposing "without first obtaining certification from the secretary for such facility, site or activity." 10 V.S.A. § 6606(a). BF Acquisition is indisputably a "person" under 10 V.S.A. § 6602(6).

However, while these are the statutes cited by the State, the legal argument the State is making for enforcement against BF Acquisition sounds wholly in the provisions of the implementing regulations. Hence, in Count 1, for example, the State alleges that "Defendants have *operated* hazardous waste storage facilities without certification" (emphasis added), whereas the State might have alleged that BF Acquisition is a *person* storing, treating, or disposing of hazardous waste without certification, using the statutory lexicon. Under the regulations, owners and operators are subject to requirements for hazardous waste treatment, storage, and disposal facilities, and the regulations cross-reference federal regulations for all

8

definitions not otherwise specified (see §7-103), including "operator".

The Hazardous Waste Management Regulations" are structured as follows:

Subchapter 1:  General Provisions
Subchapter 2:  Identification and Listing of Hazardous Waste
Subchapter 3:  Requirements for Generators of Hazardous Waste
Subchapter 4:  Requirements for Transporters of Hazardous Waste
Subchapter 5:  Requirements for Hazardous Waste Treatment, Storage, and Disposal
         Facilities
Subchapter 6:  Standards for Hazardous Wastes that are Recycled
Subchapter 7:  Manifest, Reporting and Recordkeeping Requirements
Subchapter 8:  Used Oil Management Standards
Subchapter 9:  Universal Waste Management Standards

The Regulations cover the life cycle of hazardous waste from the moment of generation, (subchapter 3) to transportation (subchapter 4) to treatment, storage, and disposal (subchapter 5). This is the so called "cradle-to-grave" regulation of hazardous waste, intended to ensure "individual responsibility" on the part of those involved at each step in the waste management process.  State v. Ben-Mont Corp., 163 Vt. 53, 59 (1994).  Under the regulations, the "generator" is the primary subject of subchapter 3, the transporter is the primary subject of subchapter 4, and the "facility" is the subject of subchapter 5.  Each of these concepts is broadly defined by statute. "Generator" means "any person, by site, whose act or process produces hazardous waste or whose act first causes a hazardous waste to become subject to regulation."  10 V.S.A. § 6602(3). "Transport" or "transportation" means "the movement of wasted by air, rail, highway, or water." 10 V.S.A. § 6602(8).  "Facility" means "all contiguous land, structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of waste.  A facility may consist of several treatment, storage, or disposal operational units."  10 V.S.A. § 6602(10).

The statutory definition of "facility" is broad enough to include, conceivably, most any site on which hazardous waste is generated.  Among other things, a facility includes any place used for storing hazardous waste.  "Storage" means "the actual or intended containment of wastes, either on a temporary basis or for a period of years; in such a manner as not to constitute disposal of such wastes."  10 V.S.A. § 6602(7).  "Container" means "any portable device in which a material is stored, transported, treated, disposed of or otherwise handled."  Regulations § 7-103.  Thus, any time hazardous waste is generated and then placed in a container for the purpose of transportation, such as to a disposal facility, it is stored on a temporary basis, which presumably converts the site of that activity into a storage facility.

The implementing Regulations, however, are less broad, and are more specific about management responsibilities of each person or entity involved with hazardous waste at various stages in the process.  Subchapter 5 of the Regulations is entitled Requirements for Hazardous Waste Treatment, Storage, and Disposal Facilities.  By its terms, "[t]he requirements of this

9

subchapter apply to owners and operators of hazardous waste facilities including all facilities which treat, store, or dispose of hazardous wastes referred to in 40 CFR Part 268." §7-501(b)  At the outset, then, Subchapter 5 only applies to owners and operators of treatment, storage, and disposal facilities.  "Operator" means "the person responsible for the overall operation of a facility."  40 C.F.R. § 260.10 (by operation of Regulations § 7-103).  "Operator" is a substantially more limited concept than "any person."

Typical "generators" and "transporters" and their operating sites are exempt from Subchapter 5 as follows:

The following facilities and activities are exempted from the provisions of this subchapter:

* * *

(g)     Generators who accumulate or place in short-term storage hazardous waste on-site in compliance with the applicable timeframes specified in Subchapter 3 of these regulations.

* * *

(i)     Transporters storing manifested shipments of hazardous waste at a transfer facility for a period of ten days or less and in accordance with Section 7-404.

Regulations § 7-502.

Subchapter 3 is entitled Requirements for Generators of Hazardous Waste.  It distinguishes among conditionally exempt generators, small quantity generators, and large quantity generators.  The reference in § 7-502(g) to "applicable timeframes" presumably is a reference to § 7-307(c)(2) in the case of small quantity generators and § 7-308(b)(2) in the case of large quantity generators.  Under these sections, small and large quantity generators lose their exempt status under Subchapter 5 unless they "ensure transport of hazardous waste off-site" within 180 days for small quantity generators and within 90 days for large quantity generators.[1]  Thus, when these time frames are exceeded, the site of a generator becomes a storage facility, and the large or small quantity generator becomes the owner or operator of the storage facility subject to regulation under Subchapter 5 by default.  This is what happened in this case to Fellows, Bryant, and Goldman, and the facts support operator liability on their part with respect to both the Fellows and Bryant Grinder facilities.

Nonetheless, the Regulations clearly distinguish among generators, transporters,

_____

[1]Conditionally exempt generators are subject to separate regulation under §7-306.

10

and owners and operators of storage and treatment facilities as regulated entities. As applied to this case, generators are not automatically operators of storage facilities, but may become so at such time as they fail to ensure proper transport of hazardous waste off-site. They then can acquire status as operators of storage facilities, and become subject to regulation under Subchapter 5.

In the Introduction to the Complaint and Application for a Preliminary Injunction, the State claims that "all Defendants are either owners or operators of the Fellows and Bryant Grinder facilities." It focuses on the conversion of the two properties to "TSDFs" (Treatment, Storage, and Disposal Facilities), and the obligations of TSDFs under Subchapter 5. The claims are set forth in the Complaint as follows:

Count 1 alleges a violation of 10 V.S.A. § 6606(a) for *operating* a storage facility without certification.

Count 2 alleges a violation of 10 V.S.A. § 6606(b)(5) for *operating* a storage facility without providing evidence of financial responsibility to ensure that the facility would be closed properly at the cessation of operations. This is a condition of certification.

Count 3 alleges a violation of Regulations § 7-309(c) for not closing down the site of hazardous waste generation at the cessation of generation. Section 7-309 applies to both small and large quantity *generators*. Section 7-309(c) sets out what a generator must accomplish at the site of generation when generation ceases.

Count 4 alleges a violation of Regulations § 7-311(d)(1) for not maintaining "a list of all hazardous waste currently in storage." This section applies to small and large quantity *generators*.

Count 5 alleges a violation of Regulations § 7-311(f)(1) for failing to properly label containers used for storing hazardous waste. This section applies to small and large quantity *generators*.

Count 6 alleges a violation of Regulations § 7-311(f)(2) for failing to maintain containers of hazardous waste in good condition. This section applies small and large quantity *generators*.

(Emphasis added.)

To summarize the counts, Counts 1 and 2 (the operator violations) assert violations which can only occur in the Regulations if the site of generation converted to a Subchapter 5 storage waste facility. BF Acquisition cannot have liability under the operator violations unless it is an owner or operator of the facility. Counts 3 through 6

11

(the generator violations) apply to any defendant who was a small quantity generator or a large quantity generator, independent of whether the site ever converted to a storage waste facility. Note that the location in question in the operator violations is the <u>facility</u> while in the generator violations it is the <u>site</u> of generation.

The Regulations appear to be very inclusive with regard to regulating generators. Nearly anyone who generates any hazardous waste will be regulated as a generator of some sort. That regulation ensures that hazardous waste gets transported to the right destination, generally a treatment, storage, and disposal facility. With the hazardous waste all funneled to those facilities, the Regulations then seek to regulate the owner or overall operator of the facility, the one with ultimate responsibility at that point for the waste. In this context, it is rational that the Regulations would have an expansive definition of "facility" and a definition of "operator" that focuses on the person or entity with the broadest authority to control the facility: that person or entity is tagged with complete responsibility.

The State's "Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction" only tangentially refers to the alleged generator violations. This occurs almost entirely in one sentence summarizing the evidence from the State investigator who visited the scene: "Hazardous wastes were not properly labeled; no inventory of hazardous wastes was being kept; containers were leaking; and freezable wastes were being stored in an unheated building." State's Memorandum filed Feb. 10, 2003 at 2. These are generator violations. The Memorandum is mostly devoted, however, to explaining why BF Acquisition has operator liability. The Memorandum concludes by asserting essentially both generator and operator violations. In the memorandum, the State does not distinguish among the defendants until discussing operator liability, at which point the State specifically mentions BF Acquisition.

Pursuant to the ruling in paragraph 2 of the Conclusions above, the issue for purposes of the present ruling, based on the evidentiary hearing, is whether BF Acquisition is an operator under the regulations.

To be an operator under the definition in the regulation, one must be the person responsible for the overall operation of a Subchapter 5 hazardous waste storage and treatment facility. The facility includes all contiguous land and structures used in the storage and treatment. In this case, we are not dealing with a facility designed for the business purpose of storing and treating hazardous waste. Rather, we are dealing with a generation site that lost its exemption from Subchapter 5 regulations and for that reason alone became a storage facility. Under the regulations, this can happen when a small or large quantity generator fails to timely transport short term stored wastes off-site. The only factual allegation in this case supporting the application of Subchapter 5 is that Fellows (and Bryant) as large quantity generators lost their exemptions by failing to timely transport stored hazardous wastes off-site. There is no factual allegation in the

complaint that the site of generation lost its exempt status because BF Acquisition, as a small or large quantity generator, failed to timely transport stored hazardous wastes off-site, and the State did not present evidence or memos in support of that position.

The more narrowly focused issue, then, is whether BF Acquisition became the overall operator of the Fellows storage facility when it took possession of the Fellows property on June 1, 2002 under its lease. The issue is not whether BF Acquisition conducted some activity involving hazardous waste; that likely would only make BF Acquisition a generator of some sort, and not necessarily the overall operator of the storage facility.

In arguing whether BF Acquisition became an operator or not, both parties have relied on decisions interpreting CERCLA definitions. The CERCLA definitions of "facility" and "operator" contrast substantially with the definitions of those terms here. The relevant definition of "operator" under CERCLA is "any person owning or operating such facility." 42 U.S.C. § 9601(20)(a)(ii). "Facility" under CERCLA means:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

42 U.S.C. § 9601(9). These definitions conform to the broad CERCLA interest in cleaning up contaminated spots. The Regulations at issue here are promulgated under RCRA legislation. See State v. Ben-Mont Corp., 163 Vt. 53, 58 (1994). Thus they seek to prevent problems with contamination in the first place, and focus on who must act and how at each step from cradle to grave. CERCLA definitions are applied within the framework of CERCLA purposes, whereas the RCRA framework is to determine and define responsibility for management of hazardous waste as it takes place in order to prevent contamination. As noted above, the definition of operator pursuant to the pertinent regulation under Chapter 159 is "the person responsible for the overall operation of a facility." 40 C.F.R. § 260.10 (by operation of Regulations § 7-103). The purpose is to determine the person or entity with the breadth of authority to be the one in charge; that is the one upon whom or which broad management responsibilities are imposed by law.

The facts show that the interest BF Acquisition acquired in the Fellows real estate was circumscribed in time, purpose, and authority. It was a short term possessory interest for the limited purpose of repair, assembly, and sale of personal property on the premises. BF Acquisition was not authorized to use the premises for any other purpose, and could renew the lease beyond 7 months only monthly, and only subject to the owner's right to terminate at any time upon 90 days notice. BF Acquisition could not alter the real estate, and had no interest in

the fixtures.[2] It did not have the authority to run the site as a hazardous waste storage facility if it wanted to do so, as the scope of its use was circumscribed by the lease terms. It had no authority to address environmental conditions on the property remaining from before it took possession. Overall authority remained in the hands of the owner of the property.

In short, the facts do not support a finding that BF Acquisition was "responsible for the overall operation" of the facility. As a matter of both language and policy, it did not have the broad right of control that an "operator" is required to have in order for it to be subject to Subchapter 5 regulations and requirements for a hazardous waste storage facility at the Fellows site. Whether it has other obligations subject to enforcement under Chapter 159 and related regulations was not the subject of the hearing for a preliminary injunction, for the reasons previously stated, and will not be addressed here.

**Order**

For the foregoing reasons,

1.      The State's Motion for Default with respect to Defendants Goldman, Fellows, and Bryant Grinder is *granted*;

2.      The State's Motion for a Preliminary Injunction with respect to Defendant BF Acquisition LLC is *denied*; and

3.      A hearing will be scheduled to address the terms of the Preliminary Injunction.

Dated at Montpelier, Vermont this __ day of May, 2003.

_____
Mary Miles Teachout
Superior Court Judge

---

[2]There were no fixtures identified on a Schedule 2.01(i) that was to be attached to the lease, so there were no fixtures leased by BF Acquisition. The facts in evidence suggest that some of the places where hazardous materials remained from industrial operations may have been in fixtures. For example, the court is not clear whether the coolant pit is a fixture and part of the premises, or an item of personal property purchased by BF Acquisition. Distinctions between fixtures and non-fixtures were not made at the hearing.